Eric E. Lynch (SBN #25049)
Jonathan G. Brinson (SBN #025045)
Michelle M. Buckley (SBN# 030617)
John R. Posthumus (*Pro Hac Vice*)
Polsinelli PC
One East Washington St., Suite 1200
Phoenix, AZ 85004
Telephone: (602) 650-2000
Facsimile: (602) 264-7033
elynch@polsinelli.com
mmbuckley@polsinelli.com

Daniel M. Petrocelli (*Pro Hac Vice*)
Jeffrey A. Barker (*Pro Hac Vice*)
O'Melveny & Myers LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com
jbarker@omm.com

*Attorneys for Plaintiffs Discovery Land Company, LLC
and Discovery Design, LLC*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Discovery Land Company, LLC; Discovery Design, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Discovery Global, LLC; Discovery Global Management Services, LLC; Denton House Interiors, Inc.; Areté Collective, LP; AC Management GP, LLC; Rebecca Buchan; Joseph Buchan; Cory Pace; and Does 1-20, <br><br> Defendants. | Case No: CV-20-01940-PHX-MTL <br><br><br> **AMENDED VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

76991854.1

Plaintiffs Discovery Land Company, LLC ("DLC") and Discovery Design, LLC ("Discovery Design") (collectively, "Plaintiffs") state the following for their Complaint against Defendants Discovery Global, LLC, Discovery Global Management Services, LLC, Denton House Interiors, Inc., Areté Collective, LP, AC Management GP, LLC, Rebecca Buchan, Joseph Buchan, Cory Pace and Does 1-20 (collectively, "Defendants"):

## NATURE OF THE CASE

1.     Although originally instituted to address the theft and misuse of DLC's valuable trademarks and trade secrets, this action now additionally seeks to redress the broader abuse of Plaintiffs' trust and confidence by former agents who sought to line their own pockets and create a competing business at Plaintiffs' expense, all while using Plaintiffs' property and disseminating a raft of false and misleading communications to Plaintiffs' actual and potential business partners and customers.

2.     Rebecca Buchan—a trusted business associate who voluntarily undertook to serve at various times as the Chief Operating Officer of DLC and the President of Discovery Design—apparently became unsatisfied with her existing relationships with Plaintiffs and their principals.  Although Ms. Buchan, her husband and their company, Denton House Interiors, Inc. had been paid approximately $60 million over the previous five years as a result of their work with Plaintiffs, Ms. Buchan wanted more.  And, as detailed herein, she sought to do so by installing her friends and family in positions with Plaintiffs, and then using her own position and theirs to conduct numerous deceitful and harmful acts to the benefit of her, them, and her companies, all to the extreme detriment of Plaintiffs.

3.     Accordingly, Plaintiffs bring this action at law and in equity for: (1) trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition and false designation of origin under 15 U.S.C. § 1125(a); (3) trademark dilution under A.R.S. § 44-1448.01; (4) common law trademark infringement and unfair competition; (5) false and misleading advertising and promotion under 15 U.S.C. § 1125(a); (6) misappropriation of trade secrets under 18 U.S.C. § 1836; (7) misappropriation of trade

2

secrets under A.R.S. §§ 44-401 to 44-407; (8) unjust enrichment; (9-10) multiple breaches of fiduciary duty; (11) professional negligence; and (12) aiding and abetting tortious conduct.

## PARTIES

4.    Plaintiff DLC is a Delaware limited liability company with its principal place of business at 14605 N. 73rd Street, Scottsdale, AZ 85260.

5.    Plaintiff Discovery Design is a Delaware limited liability company with its principal place of business at 14605 N. 73rd Street, Scottsdale, AZ 85260.

6.    Defendant Discovery Global, LLC ("DG") is a Delaware limited liability company with its principal place of business at 4670 South Holladay Village Plaza, Suite 200, Salt Lake City, Utah 84117.

7.    Defendant Discovery Global Management Services, LLC ("DGM") is a Delaware limited liability company with its principal place of business at 4670 South Holladay Village Plaza, Suite 200, Salt Lake City, Utah 84117.

8.    DGM is the sole managing-member of DG.

9.    Defendant Denton House Interiors, Inc. ("Denton House") is a Utah corporation with its principal place of business at 4670 South Holladay Village Plaza, Suite 200, Salt Lake City, Utah 84117.

10.    Defendant Areté Collective, LP ("AC") is a Utah limited partnership with its principal place of business at 4670 South Holladay Village Plaza, Suite 200, Salt Lake City, Utah 84117.

11.    Defendant AC Management GP, LLC ("ACM") is a Utah limited liability company with its principal place of business at 4670 South Holladay Village Plaza, Suite 200, Salt Lake City, Utah 84117.

12.    ACM is the general partner of AC.

13.    Defendant Rebecca Buchan ("Buchan") is the founder and Chief Executive Officer of Denton House and AC, the sole managing-member of DGM, and upon information and belief, the managing-member of ACM.  At all times relevant to the

76991854.1

claims set forth herein, Buchan was authorized to and did act as the agent and representative of Denton House, DG, DGM, AC, and/or ACM. Buchan also previously rendered services to Plaintiffs as the Chief Operating Officer of DLC and President of Discovery Design.

14.    Defendant Joseph Buchan is the Chief Financial Officer of Denton House and, upon information and belief, also serves in a similar capacity at AC. At all times relevant to the claims set forth herein, Joseph Buchan was authorized to and did act as the agent and representative of at least Denton House.

15.    Defendants Rebecca Buchan and Joseph Buchan are a married couple domiciled in Utah. All of the wrongful individual conduct alleged herein by Buchan and Joey Buchan was taken on behalf of, and to benefit, their martial community.

16.    Defendant Cory Pace ("Pace") is an individual who resides in Maricopa County, Arizona and previously served as the Vice President of Finance for Discovery Design at Discovery Design's offices in Arizona. Pace is also licensed as a Certified Public Accountant in the State of Arizona.

17.    Defendants Does 1 through 20 ("Fictitious Defendants") are those individuals or entities that are, and were at all times material hereto, alter egos, partners, joint venturers, instrumentalities, predecessors, successors, principals, or agents of the named Defendants or Fictitious Defendants and are in some manner legally liable to Plaintiffs in this action. Plaintiffs will seek leave to amend their Complaint when the true names of the Fictitious Defendants become known.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), and supplemental jurisdiction over the claims arising under the state and common law pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' Lanham Act claims and the Defend Trade Secrets Act claim that they form part of the same case in controversy.

19.    Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b)

because a substantial part of the acts giving rise to this cause of action occurred within this District.  Defendants have committed and are committing numerous tortious acts designed to intentionally and maliciously interfere with and to disrupt the business operations of Plaintiffs in this District.  Defendants have breached fiduciary duties, engaged in negligent acts, aided and abetted tortious conduct and/or have committed (and are continuing to commit) acts of unfair competition, false and misleading advertising, dilution of and infringement of DLC's trademarks, misappropriation of DLC's trade secrets.

20.    This Court has personal jurisdiction over each of the Defendants for the acts underlying the basis for this Complaint by virtue of having sufficient minimum contacts within the State of Arizona, in accordance with the broadest reach of and consistent with Arizona's Long Arm Statute as follows:

a.    DG and DGM (collectively, the "DG Defendants"), with knowledge of Plaintiffs' presence in this District and intending to cause harm to Plaintiffs in this District, have purposefully and intentionally: (i) directed communications to Plaintiff and, upon information and belief, others in Arizona using the DISCOVERY marks and the "Discovery Global" name/mark after being informed by DLC to cease doing so;  (ii) pursued business opportunities in Arizona (*i.e.*, a development project in Sedona, Arizona) and, upon information and belief, sent communications to consumers in Arizona in furtherance of such business; (iii) worked directly with Plaintiffs' executives in Arizona intending to establish a business venture with continuing and wide-reaching contacts in the forum; (iv) upon information and belief, solicited business from customers and potential customers of Plaintiffs in Arizona using the DISCOVERY marks; (v) upon information and belief, held themselves out to third parties in Arizona as affiliated with Plaintiffs without authorization; (vi) threatened to use and, upon information and belief, have used DLC's confidential trade secret information to solicit actual and prospective customers in Arizona; (vii) have used DLC's trademarks and trade secret information, rightfully vested in DLC and which DLC manages and controls in Arizona; (viii)

committed acts of unfair competition, dilution and infringement of DLC's trademarks causing harm to DLC and/or others in Arizona that are related to or who are customers of Plaintiffs and rely upon DLC to police and protect the goodwill associated with the DISCOVERY marks; (ix) have unjustly enriched themselves by misappropriating DLC's goodwill, reputation, trademarks and financial contributions in this District; and (x) availed themselves of this Court's jurisdiction through their systematic tortious acts directed towards Plaintiffs as well as their established efforts and commercial ambitions to conduct business in Arizona such that the DG Defendants should have expected that their actions would subject them to this Court's jurisdiction.

b.    AC and ACM (collectively, the "AC Defendants"), with knowledge of Plaintiffs' presence in this District and intending to cause harm to Plaintiffs in this District, have purposefully and intentionally: (i) pursued business opportunities in Arizona (*i.e.*, a development project in Sedona, Arizona and a "strategic relationship" with an Arizona-based provider of hotel asset management and owner advisory services) and, upon information and belief, sent communications to consumers in Arizona in furtherance of such business; (ii) upon information and belief, solicited business from consumers in Arizona using false and misleading advertisements and promotional materials; (iii) threatened to use and, upon information and belief, have used DLC's confidential trade secret information to solicit DLC's actual and prospective customers in Arizona; and (iv) availed themselves of this Court's jurisdiction through systematic tortious acts directed towards Plaintiffs as well as established efforts and commercial ambitions to conduct business in Arizona such that the AC Defendants should have expected that their actions would subject them to this Court's jurisdiction.

c.    The minimum contacts subjecting the DG Defendants and AC Defendants to jurisdiction in this District are imputed to Denton House by virtue of its common enterprise/joint venture relationship with the DG Defendants and AC Defendants.

d.    Buchan, with knowledge of Plaintiffs' presence in this District and intending to cause harm to Plaintiffs in this District, purposefully and intentionally: (i)

76991854.1

agreed to and, in fact, performed services in this District as an executive and authorized agent for Plaintiffs, subject to Plaintiffs' control; (ii) routinely traveled to Arizona in furtherance of Plaintiffs' business activities; and (iii) maintained regular (often daily) e-mail and telephone contact with Plaintiffs' Arizona offices, directly supervised Plaintiffs' employees in Arizona, worked in tandem with Plaintiffs' executives in Arizona and reported to Plaintiffs' executives in Arizona.

  e. Pace resides within this District and, with knowledge of Discovery Design's presence in this District and intending to cause harm to Discovery Design in this District, agreed to and, in fact, performed services in Arizona as an executive and authorized agent for Discovery Design.

<b><u>COMMON ENTERPRISE / JOINT VENTURE</u></b>

  21. The DG Defendants and Denton House have operated as a common enterprise or joint venture while engaging in the wrongful conduct and other violations of law alleged below.  The DG Defendants and Denton House are intimately intertwined companies that work closely together for the common purpose of marketing and selling real estate development services and products.  Each company has an interest in making "Discovery Global" a profitable enterprise.  The DG Defendants and Denton House have common ownership, officers, and/or managers who exercise control and management of the venture.  Because the DG Defendants and Denton House have operated as common enterprise or joint venture, each of them is jointly and severally liable for the acts and practices alleged below.

  22. The AC Defendants and Denton House have operated as a common enterprise or joint venture while engaging in the wrongful conduct and other violations of law alleged below. The AC Defendants and Denton House are intimately intertwined companies that work closely together for the common purpose of marketing and selling real estate development services and products.  Each company has an interest in making "Areté Collective" a profitable enterprise.  The AC Defendants and Denton House have common ownership, officers, and/or managers who exercise control and management of

7

the venture.  Because the AC Defendants and Denton House have operated as common enterprise or joint venture, each of them is jointly and severally liable for the acts and practices alleged below.

## **GENERAL ALLEGATIONS**

**I.    Plaintiffs' Operations**

23.    Founded in 2000 by its Chief Executive Officer, Michael S. Meldman ("Meldman"), Plaintiff DLC is a full service real estate development company specializing in private residential club communities and resorts in the U.S. and around the globe. DLC has grown to be a market leader in the high-end resort residential niche with 24+ world-class projects in its portfolio and more forthcoming.

24.    DLC has developed private club communities located in: British Columbia, Canada; Comporta, Portugal; Barbuda, West Indies; Austin, Texas; Nashville Tennessee; Rio San Juan, Dominican Republic; Cabo San Lucas, Mexico; Las Vegas, Nevada; Westhampton Beach, New York; Amenia, New York; Maui, Hawaii; Big Sky, Montana; Coeur d'Alene, Idaho; Los Cabos, Mexico; La Quinta, California; Great Guana Cay, Bahamas; Cashiers, North Carolina; La Quinta, California; Westlake, Texas; Kohala, Hawaii; Whitefish, Montana; and Scottsdale, Arizona.

25.    DLC is also currently working to expand its portfolio with communities and high-end luxury hotels in the United Kingdom, Ireland, Scandinavia, Switzerland, Germany, Italy, Saudi Arabia, Africa and other locations around the world and U.S.

26.    DLC has several affiliates operating under its umbrella and brand, including: Plaintiff Discovery Design, Discovery Builders, LLC ("Discovery Builders") and a magazine titled *Discovery Life*.

27.    Discovery Design is a separate company that provides furnishings and design/architectural services to its residential and commercial clients at DLC's club communities.  DLC's other affiliate, Discovery Builders, is a separate homebuilding company that coordinates the design and construction of distinctive finished residences for DLC's development projects.

76991854.1

## II.    DLC's Trademarks

28.    DLC owns two federal trademark registrations—one is for the Discovery Land Company mark and logo, U.S. Reg. No. 4,311,292 (registered on April 2, 2013, now incontestable) [*see* Exhibit A], and the second is for the word mark Discovery Land Company, U.S. Reg. No. 5,622,442 (issued on December 4, 2018) [*see* Exhibit B] (collectively, the "DISCOVERY marks").

29.    DLC's composite mark was registered on April 2, 2013 and assigned U.S. Reg. No. 4,311,292.  The mark as registered is set forth below:



30.    DLC's composite mark was first used in commerce as early as 2000 and updated in 2006.  As depicted above, the mark includes a mariner's compass log with compass points and the letter "D" at the center.  The mark also includes the stylized word "Discovery" above the words "Land Company."

31.    The composite mark is registered in International Class 37 and covers the following goods and services:  "Real estate development, real estate site selection, land development services, namely, development of planned communities and golf courses, planning and laying out of residential communities and golf courses, construction services, namely, planning, laying out and custom construction of residential developments and golf courses, online information services in the fields of the development of planned communities and residential developments and development of recreational facilities and golf courses."  The mark is also registered in International Class 41 and covers the following goods and services: "country club services, golf courses, providing recreational facilities for use as golf courses, online information services in the

76991854.1

field of golf, golf courses, recreational facilities and recreation." For Class 41, the mark was first used in commerce on August 8, 2009.

32.    DLC's U.S. Reg. No. 4,311,292 for the composite mark is now incontestable. The mark has been in use for five consecutive years subsequent to the date it was registered, is still in use, there has been no final decision adverse to DLC's claim of ownership or right to register, there is no proceeding involving said rights pending and an affidavit of incontestability was filed with the U.S. Patent and Trademark Office on April 23, 2018 and acknowledged on May 3, 2018.

33.    DLC's word mark was first used in commerce as early as 2000. The word mark was registered on December 4, 2018 and assigned U.S. Reg. No. 5,622,442. The mark as registered appears below:

# DISCOVERY LAND COMPANY

34.    DLC's word mark is registered in International Class 37 for: "real estate development, real estate site selection, land development services, namely, development of planned communities and golf courses, planning and laying out of residential communities and golf courses, planning and laying out of residential communities, construction services, namely, planning, laying out and custom construction of residential developments and golf courses, online information services in the fields of the development of planned communities and residential developments and development of recreational facilities and golf courses." The mark is also registered in International Class 41 for: "country club services, golf courses, providing recreational facilities in connection with golf and water sports, online information services in the field of golf, golf courses, recreational facilities and recreation."

35.    DLC and its authorized affiliates have continuously and extensively advertised, marketed and promoted their development services and exclusive communities using the DISCOVERY marks in the United States and throughout the world since 2006. DLC has not stopped using the DISCOVERY marks in commerce,

76991854.1

transferred or assigned ownership of the marks, or abandoned them in any way.

36.    DLC has expanded its related brands over the years as its service offerings have expanded to include: Discovery Design, Discovery Builders and *Discovery Life*.

37.    DLC has always had complete control of its brand and the DISCOVERY marks in order to protect its hard-earned reputation with the clientele it serves.

38.    DLC uses the DISCOVERY marks in various capacities—*e.g.*, on its website and in its domain name, in promotional brochures and marketing materials, in its magazine—*Discovery Life*, in connection with the Discovery Land Company Foundation (which contributes funds to non-profit organizations in the communities where DLC operates club communities) and in every other facet of its business and promotional activities.

39.    DLC has expended enormous sums of money (over $50,000,000) to promote the DISCOVERY marks. Through DLC's efforts, the DISCOVERY marks have acquired secondary meaning and distinctiveness among consumers and members of the industry, and the marks continue to have secondary meaning and distinctiveness. The DISCOVERY marks are now widely known and recognized as a signifier of DLC's private club communities that offer world-class services and unparalleled amenities.

40.    The DISCOVERY marks identify to consumers and members of the industry that DLC is the source of the luxurious services and exclusive properties, and the marks have come to be, and now are, well and favorably known to the public, particularly to consumers, as being associated with DLC's unparalleled luxury and service.

41.    The DISCOVERY marks are an integral part of DLC's brand. Consumers associate the marks with DLC's goodwill and reputation as a world leader in the market.

42.    DLC's business model—high prices, a strong emphasis on exclusivity and privacy, and a relaxed and comfortable approach to reduce the intimidation factor—sets it apart from other golf clubs, luxury resorts and communities.

43.    To protect its goodwill and reputation, DLC maintains the highest standards

11

in every aspect of its operations.  For example, DLC's communities: (i) integrate the local architecture, culture and cuisine of the location; (ii) offer members world-renowned golf courses, state-of-the-art fitness facilities and unique outdoor concierge programs; (iii) focus on sustainable efforts and create programs that ensure the community is a source of local economic growth and stability; and (iv) offer turn-key homes for families that embody modern aesthetics while staying true to classic principles.

44.    DLC's efforts have not gone unnoticed.  Recent accolades include: (i) DLC's CEO Meldman being recognized as one of the "Most Influential Developers" by *Golf Inc. Magazine* in its January/February 2020 issue; (ii) DLC's communities being recognized as "Best of the Best" by *Robb Report Vacation Homes* and "Best of Paradise" by *Luxury Living Magazine*; and (iii) numerous publications including, but not limited to, *The New York Times*, *Forbes*, *Business Insider*, *The Times*, *Mansion Global*, *CSQ*, *Quest Magazine*, *Modern Luxury Interiors*, *The Financial Times*, and *Executive Golfer* publishing articles touting the excellence of DLC and Meldman.

### III.    DLC's Trade Secret Customer Database

45.    DLC's customers include land sellers, joint venture developers, capital partners and end-user home purchasers.

46.    Because DLC conducts business in the high-end tier of the luxury market (*e.g.*, home prices range from $3,000,000 to over $20,000,000), its customer-base is limited and transactions often involve repeat customers.  As a result, business development and customer relations are an integral part of DLC's operations.

47.    DLC expends significant resources (time and money) to identify, cultivate and maintain strong relationships with its elite clientele and prospective customers.  For example, DLC's communities have drawn high-profile guests/owners including, professional athletes, movie stars, recording artists, and business magnates.

48.    DLC's business development efforts contribute substantially to its overall success, goodwill and reputation.

49.    Over the past 20 years in the luxury development market, DLC has

compiled and maintained an extensive customer list and database that includes, among other things, valuable and detailed information and spreadsheets with: (i) contact and financial information for more than 30,000 current owners, prior owners, and qualified prospects; (ii) data regarding DLC's past sales and transactions; and (iii) club membership lists for DLC's communities (collectively, the "Customer Database").

50.    DLC's Customer Database includes over 375 current and prospective customers located in Arizona and the database is maintained by DLC at its Arizona offices and other locations.

51.    DLC compiled the information in its Customer Database at great effort and expense over time, and much of the information contained therein is not publically available or readily obtainable from other sources.

52.    The information compiled in the Customer Database is not generally known to the public, and DLC takes numerous steps to maintain the secrecy and confidentiality of its Customer Database.  The Customer Database is stored on password-protected company computers and independent third-party servers protected by a network firewall. Access to the Customer Database is provided only to a very limited number of DLC's executives and personnel. DLC has also instituted written policies prohibiting external use or disclosure of its Customer Database.

53.    DLC's Customer Database is a tremendous asset that provides DLC a district competitive advantage in the market.  Using the Customer Database, DLC is able to create initial sales momentum at new projects by directing personalized sales and marketing efforts to customers with an established interest in the high-end luxury market.

54.    Appropriation and use of the Customer Database by competitors would cause severe detriment to DLC and provide an unfair advantage and great economic benefit to competitors.

## IV.    Defendant Rebecca Buchan

55.    Buchan is the founder and Chief Executive Officer of Denton House—an interior design and architectural firm that provided services to Discovery Design pursuant

76991854.1

to an Independent Contractor Agreement (the "ICA").

56.    Pursuant to the ICA, Discovery Design contracted with development entities and individual clients at DLC communities to provide design services, which services are then fulfilled by Denton House.

57.    Due to the close (and what Plaintiffs understood to be mutually beneficial) working relationship between Denton House and Discovery Design on scores of projects over many years, Buchan offered to provide additional services directly to Discovery Design.  In or about 2012, Buchan's role expanded to the point that she took on the title and responsibilities of President for Discovery Design.

58.    Through her executive role with Discovery Design, Buchan was involved in various design and planning activities as well as broad initiatives for DLC's current and prospective development projects.  Through that involvement, and with the consent of Discovery Design, Buchan was able to direct even more business to her company, Denton House.  Because Buchan was a trusted agent, among other privileges, she was granted access to Discovery Design's and DLC's computer files and systems.

59.    In late 2018 or early 2019, Buchan—without formal authorization or approval—expanded her involvement with Plaintiffs by designating herself not just as an executive of Discovery Design, but also as DLC's Chief Operating Officer ("COO").

60.    DLC did not object to Buchan's self-appointed COO role, and in fact acquiesced in Buchan voluntarily assuming even greater responsibilities directly to DLC, as she had become very involved over the years in Plaintiffs' businesses, and was trusted.

61.    Acting as Plaintiffs' authorized agent, Buchan was engaged in many aspects of Plaintiffs' operations including, but not limited to:

    a.    participating in executive level meetings where policies, operations and projects were discussed and considered;

    b.    overseeing performance of Discovery Design's contracts—*i.e.*, the ICA and design contracts with development entities and individual clients;

    c.    addressing Human Resource issues, taking an active role in the

76991854.1

elevation/demotion of pay levels as well as the hiring/firing of Plaintiffs' employees;

d.    assisting in the design and marketing of existing DLC communities including, but not limited to, "James Island" in British Columbia, "CostaTerra" in Portugal, "Playa Grande" in the Dominican Republic and "Chileno Bay" in Mexico; and

e.    developing strategy, business plans and/or master planning concepts for new prospective DLC-sourced development projects including, but not limited to, "Amaala" in Saudi Arabia, "La Nosy Mitsio" in Madagascar and "Mayflower" in Utah.

62.    When communicating with actual and prospective customers, Buchan identified herself as Discovery Design's President or DLC's COO, used the DISCOVERY marks and represented that her work was in furtherance of DLC development projects.

63.    At all relevant times, it was understood that the services Buchan performed as the President of Discovery Design, and later as DLC's COO, benefited Buchan financially as she was in positions where she could direct substantial work as well as tremendous revenues to Denton House under the ICA.  For example, Discovery Design paid Denton House over $60 million for the time period of 2015-2020, with payments rising to more than $13,000,000 in 2017, over $15,000,000 in 2018 and over $21,000,000 in 2019.

V.    **Installation of Buchan's Friends and Family at DLC and Discovery Design**

64.    Using her executive role and authority to perform Human Resources functions, Buchan was able to hire, and in fact did hire, her friends, family and preferred applicants into numerous positions at DLC and Discovery Design.

65.    Among the persons who Buchan was able to install in positions at DLC, Discovery Design, and their affiliates were: (a) Tom Hogan, who was hired as DLC's Chief Financial Officer; (b) her son-in-law Ryan Butters, who provided services on Special Projects for DLC; (c) Soo Hong, who was hired as DLC's HR Manager; and (e) James Bailey, who provided IT services to DLC and its affiliates.

76991854.1

**VI.    Buchan and Her Allies Take Advantage of Plaintiffs' Trust**

66.    Defendant Pace—the VP of Finance for Discovery Design—was responsible for administering the invoices submitted by Denton House and payments made by Discovery Design under the ICA.   In that role, Discovery Design expected (and Pace's duties required) that he protect Discovery Design's interests by critically examining and challenging any aspects of Denton House's invoices that did not comply with the terms of the ICA or Discovery Design's contracts with clients and development entities at DLC communities.  As Discovery Design recently discovered, however, that did not happen.

67.    Instead, from June 2015 through July 2020, Buchan—acting in bad faith for the benefit of herself and Denton House, and to the detriment of Discovery Design— instructed Pace (who, at all times, was located in Arizona) to make payments to Denton House (from Discovery Design's Arizona bank account) greatly exceeding the amounts due under the terms of the ICA.

68.    For example, through Pace, Buchan—either personally or through her husband Joseph Buchan, acting his capacity as the CFO of Denton House—was able to direct payments to Denton House for:

a.    invoices that did not allocate proper fee splits for consulting fees, credits or refunds per the terms of the ICA;

b.    invoices for work that had not been performed or delivered to Discovery Design's clients; and

c.    invoices with inaccurate and inflated labor or material costs.

69.    Buchan, either personally or through her husband Joseph Buchan, also on numerous occasions instructed Pace to write-off substantial amounts as "bad debt" in order to maximize Denton House's profits.

70.    In violation of his duties to Discovery Design, Pace followed Buchan's and Joseph Buchan's instructions without question or concern, failing to inform Discovery Design's owners or its General Counsel, that Denton House's invoices were inconsistent

16

with the terms of ICA or that Denton House routinely failed to provide documentation to substantiate its invoices (as required under the ICA).

71.    Pace also never informed Discovery Design that Buchan (or Joseph Buchan) was instructing him to make unauthorized payments to Denton House.

72.    The conduct by Buchan, Joseph Buchan and Pace described above was all done without the knowledge or permission of Plaintiffs, who remained unaware throughout that Buchan had coopted Pace and was routinely seeking to line her own pockets through improper, inflated and unsubstantiated invoices from Denton House, all to Plaintiffs' detriment and at Plaintiffs' expense.

**VII.    The DG Defendants**

73.    In the summer of 2019 (before Plaintiffs had become aware of her double-dealing), Buchan contacted DLC's CEO Meldman and proposed that Denton House and DLC collaborate on certain development projects under a new business venture using DLC's brand.  At the time, Meldman was open to forming such a venture because he believed a collaboration operating under DLC's umbrella would be successful given the value of the DISCOVERY marks, DLC's esteemed reputation, and Buchan's familiarity with DLC's business practices.

74.    At all times, however, Meldman made clear to Buchan that he would only consider a new venture if DLC had a controlling interest in the operation, management and income of the company to maintain and protect DLC's reputation, marks, customer base and goodwill.

75.    Throughout the discussions regarding the potential formation of a new venture, Buchan continued to serve as DLC's COO.  At all relevant times, that continued services was subject to the parties' then-existing understanding that such an arrangement was beneficial to Buchan by virtue of the increased opportunities and work for Denton House that Buchan was positioned to procure for herself.  At no time did Buchan assert to DLC or Meldman—nor did DLC or Meldman ever agree—that any services she provided as DLC's COO were related to, or in furtherance of, the potential new venture.

76991854.1

76.     Although Buchan and Meldman discussed that the proposed venture would involve a subset of DLC projects outside of the United States, they did not initially discuss which, if any, existing or prospective DLC projects would be contributed to a new venture.

77.     In October 2019, DLC's Chief Development Officer, Tom Collopy and Buchan—representing herself as DLC's COO—sent a proposal, an updated "Discovery Land Company Presentation," a development summary and conceptual master plans to Premium Luxury Integrated Resorts at the Public Investment Fund of Saudi Arabia ("Integrated Resorts") regarding a new luxury development project on Saudi Arabia's northwestern coast that Mr. Collopy had sourced (the "Amaala project").

78.     The proposal—using the DISCOVERY marks—outlined DLC's interest in serving as sub-developer of branded residential and club communities at the Amaala project.  This proposal was prepared after months of discussions and meetings with Integrated Resorts which were initiated by Mr. Collopy on behalf of DLC in May 2019.

79.     In December 2019, Integrated Resorts expressed desire to enter into a contract with DLC to provide conceptual master plans for the Amaala project.

80.     In order to conduct business with the Kingdom of Saudi Arabia, DLC had to form a new legal entity to be registered with the Ministry of Commerce.  On December 18, 2019, Buchan e-mailed DLC's executives and proposed "our future Saudi entity could be named 'Discovery Global.'"

81.     On December 27, 2019 (without the knowledge or consent of DLC), Buchan independently formed DG and DGM under the law of Delaware.  Buchan did not name or identify DLC or Meldman as a member/owner of either company.

82.     Also without the knowledge of consent of DLC, Buchan executed Operating Agreements for DG and DGM that failed to provide DLC with a controlling interest (or even any interest) in the operation, management and income of either company.  Instead, Buchan appointed herself as the sole managing-member of DGM and DGM as the sole managing-member of DG.

18

83.    On January 28, 2020, DG entered into a "Services Agreement" with Integrated Resorts to prepare iterative master plans for the Amaala project. This contract did not obligate DG to develop a DLC-branded project at the location, nor would DG have had the authority or ability to use DLC's name or marks unless the new venture was formed and DLC agreed to contribute and authorize the use of the DISCOVERY marks. Rather, DG agreed to prepare a "strategic vision and position presentation" for the project.

84.    Prior to executing the Services Agreement on behalf of DG, Buchan sent a text message to Meldman acknowledging the parties had not completed the then-ongoing discussions regarding ownership of DG/DGM, which she expected to be continuing "next week." As Buchan explained, she wanted to obtain a financial commitment from Integrated Resorts in order to "cover the direct costs of Denton House and DLC."

85.    Following execution of the Services Agreement, Buchan continued to work in tandem with DLC's executives and employees in Arizona on development concepts for the Amaala project.

86.    In April 2020, Buchan—representing herself to be acting as DLC's COO—sent Integrated Resorts a presentation and iterative master plans for the Amaala project. The presentation: (i) used the DISCOVERY marks; (ii) stated "Discovery Land Company, LLC is proposing the creation of a new DLC Resort, Hotel and private Lifestyle Community"; (iii) promoted DLC's "identifiable" and "internationally recognized" brand, "proven business model," turn-key services by Discovery Builders and Discovery Design and marketing opportunities for referrals through the "DLC database."

87.    Integrated Resorts advised on May 19, 2020 that it wanted to move forward with the "original Discovery Land Company Optimized Master Plan."

88.    On May 21, 2020, Buchan executed a First Amendment to the Operating Agreement for DGM adding Tom Collopy—DLC's Chief Development Officer, working out of DLC's offices in Arizona—as a 50% owner/member.

89.    The following week, Buchan and Meldman met in Las Vegas, Nevada to

discuss terms for ownership and management of DG and DGM.

90.    Shortly thereafter, on June 2, 2020, Buchan sent Meldman an e-mail summarizing her expectations for DG and DGM.  Buchan, among other things, proposed:

a.    DG as a partnership between DLC and DGM, splitting **net** revenues 60% to DLC and 40% to DG;

b.    DGM as a partnership between Tom Collopy (DLC's CDO), Ryan Butters (Buchan's son-in-law and DLC's then-VP of Business Strategy and Analytics), Tom Hogan (DLC's then-CFO), and Buchan (DLC's then-COO and Denton House's CEO);

c.    DGM would have complete managerial authority for DG;

d.    DLC would contribute five DLC-sourced/branded development projects to DG—*i.e.*, "Amaala" in Saudi Arabia; "La Nosy Mitsio" in Madagascar; "Lisbon City Club" in Portugal; "Sardinia" in Italy; "CostaTerra" in Portugal; and

e.    Discovery Design would be dissolved with its employees being incorporated into DG.

91.    Buchan's "expectations" for the potential venture were not consistent with those of DLC or Meldman, however.  On July 11, 2020, Meldman rejected Buchan's proposed terms, provided a revised draft Amended and Restated Operating Agreement for DG and outlined DLC's proposal for the prospective venture, stating: "**if we decide to move forward, I need to control my brand and management of the company**."

92.    Consistent with the prior discussions between Buchan and Meldman, DLC proposed:

a.    DG as a partnership between DLC and DGM, splitting **gross** revenues 60% to DLC and 40% to DG;

b.    the managing-member of DG would be Discovery Land Enterprises, LLC (a DLC affiliate in which Buchan has no interest or control) with complete managerial authority and the ability to protect DLC's valuable name, goodwill, and trademarks;

20

c.    DGM would be owned and controlled independently of DG with DGM's employees/agents serving as the execution team for approved DG projects;

d.    DLC would contribute four DLC-sourced/branded development projects to DG—*i.e.*, "Amaala" in Saudi Arabia; "La Nosy Mitsio" in Madagascar; "Lisbon City Club" in Portugal; and "Sardinia" in Italy; and

e.    use of DLC's brand would be "**permitted only with specific approval**."

93.    Buchan rejected DLC's proposed terms on July 15, 2020 refusing to provide DLC a controlling interest in DG through its affiliate Discovery Land Enterprises, LLC, and insisting that additional DLC-sourced/branded projects—*i.e.*, "Costa Terra" in Portugal; "Mayflower" in Utah; and "Homewood" in California—be contributed to the venture.

94.    On July 17, 2020, Buchan revealed (unbeknownst to Plaintiffs) that the work she performed while acting and representing herself as Plaintiffs' COO was, in fact, being performed as an agent of the DG Defendants.  Specifically, Buchan sent Meldman a summary of purported "DG projects [] pending contract completion, under LOI or with our planning team"—which, upon information and belief, was prepared by Buchan and DLC's CFO Tom Hogan, who was hired by Buchan.

95.    The summary entitled "Discovery Global 10 Year Project Projections" listed fourteen projects in DG's alleged "pipeline"—which included existing DLC projects (*i.e.*, "CostaTerra" in Portugal and "Amaala" in Saudi Arabia) as well as prospective DLC projects in Madagascar, Italy, Switzerland, Spain, Utah, and Arizona.

96.    For example, the DG Defendants' summary projects annual revenues of $225,000 in 2021 and revenues of $53,550,000 over the next ten years for a project in Sedona, Arizona.

97.    Despite continued negotiations, Buchan and Meldman could not reach an agreement as to the ownership, management and income of the prospective DG venture.

98.    On July 21, 2020, Buchan sent Meldman an e-mail stating:

21

a.    there was no need to create a partnership within DG if DLC would not contribute the "CostaTerra" project;

b.    all of the projects in DG's alleged "pipeline" (except the Amaala project) were "facilitated" by Denton House;

c.    the DG Defendants would "continue on our own," meaning that they intended to pursue projects in direct competition with DLC; and

d.    a "branding (and revenue sharing) agreement" could be negotiated for any DLC-branded projects developed by the DG Defendants.

99.    In response, Meldman instructed:

a.    DLC would consider a branding/revenue agreement on a "deal-by-deal basis";

b.    DLC had rights to all projects in DG's alleged "pipeline" as each project was sourced using DLC's brand and resources; and

c.    "**you will need to change the name of Discovery Global so this is not confusing to the market**."

**VIII.    Buchan's Escalating Demands and Destruction of the Parties' Business Relationship**

100.    When negotiations between Buchan and Meldman relating to the prospective DG venture failed, Denton House—through Buchan herself, Joseph Buchan and others authorized to act at Denton House's direction—began making near-daily calls and other communications to Discovery Design in Arizona, demanding payment from Discovery Design for amounts allegedly due and owing under the ICA.

101.    Denton House's escalating and extensive demands prompted an investigation and audit of the many transactions between Denton House and Discovery Design, going back several years. As a result of that investigation and audit (which are ongoing) Discovery Design became aware that, notwithstanding Pace's job responsibilities and obligation to protect Discovery Design's interests, Pace had been fully coopted by Buchan, Joseph Buchan and Denton House such that he had been acting

76991854.1

in Denton House's interests, and against the interests and direction of Discovery Design for many years.

102.    On or about July 27, 2020, as a result of its discovery of Pace's and Buchan's malfeasance and double-dealing, Discovery Design terminated its agency relationship with Pace.  Within days of his termination, however, Pace was immediately hired by Buchan to act as *Denton House's* VP of Finance & Accounting.

103.    On or about July 28, 2020, Buchan formally ended her agency relationship with Plaintiffs and "resigned" her COO position.  Several other executives and employees of DLC similarly resigned in July 2020 and now work for Buchan's new company, AC.

104.    Before terminating her agency relationship, in what could only be an effort to cover up her and others' misdeeds while working for DLC and Discovery Design, Buchan deleted a significant number of files—in excess of 61,687—from DLC's computer servers.  The files that Buchan deleted covered the time period between July 30, 2018 and July 27, 2020.  DLC's investigation into the files that Buchan deleted is ongoing, and some have been recovered.

105.    Buchan's attempt to purge a significant number of DLC files prior to her departure was an act of bad faith and effort to conceal and spoliate evidence of Defendants' unlawful conduct.

IV.    **DG Defendants' Infringing and Misleading Use of the DISCOVERY Marks**

106.    After the venture negotiations between Buchan and DLC fell apart, on or about August 4, 2020, counsel for Plaintiffs advised counsel for Defendants that "DG usurped DLC personnel, assets, project(s), good-will and reputation to position itself in the same or similar market and industry to DLC" and any "continued use of the [] Discovery brand by [the DG Defendants, Denton House and Buchan] is actionable and undoubtedly creates a likelihood of confusion."

107.    Throughout the early weeks of August, the parties sought to resolve their differences, including discussing a potential branding/revenue agreement between DLC and DG concerning the Amaala and La Nosy Mistsio projects.  During those discussions,

however, DLC was always clear that "[u]se of Discovery Global [name] will be a conflict. Pursuing projects independently means under a non-Discovery name unless a revenue/brand share agreement is in place for a specific project."

108.    Negotiations for a branding/revenue agreement ceased on or about August 17, 2020 when DG and Denton House filed a lawsuit in Utah against Plaintiffs (the "Utah action").

109.    Notwithstanding the parties' failure to reach an agreement and DLC 's clear direction to cease use of the DISCOVERY marks, the DG Defendants continued to do so in their efforts to unfairly compete with DLC, trade on its goodwill and reputation and mislead consumers into believing the DG Defendants were still associated with DLC.

110.    On July 28, 2020 (the same day that Buchan resigned her COO position and seven days after Meldman instructed Buchan to cease use of the name, "Discovery Global"), Buchan—acting on behalf of the DG Defendants—sent a letter to Integrated Resorts with an "updated" proposal and presentation for the Amaala project using the DISCOVERY marks.  The letter also displays a "Discovery Global" logo mimicking the DISCOVERY marks as depicted below:

DISCOVERY LAND COMPANY        

111.    On August 1 and 2, 2020, Buchan sent an e-mail (using the e-mail address Becky@discoveryglobal.co and a signature block with a link to DLC's website) to Dolphin Capital, a United Kingdom/Greek financial firm that conducts business with DLC stating that she "would love to discuss" the possibility of working together. Buchan's signature block appears virtually identical to the one she used as DLC's COO as depicted below:

76991854.1

**REBECCA BUCHAN | COO**
**Discovery Land Company**
4670 South Holladay Village Plaza, Salt Lake City, UT 84117
O: (801) 333-8156
M: (801) 550-3484
www.discoverylandco.com

**REBECCA BUCHAN | COO**
**Discovery Global**
4670 South Holladay Village Plaza, Salt Lake City, UT 84117
O: (801) 333-8156
M: (801) 550-3484
www.discoverylandco.com

112.    On or after August 22, 2020, Buchan on behalf of the DG Defendants sent Integrated Resorts an "updated" presentation using the DISCOVERY marks.

113.    On August 25, 2020, Buchan sent an e-mail (using Becky@discoveryglobal.co and a signature block with a link to DLC's website) to DLC's CDO, Tom Collopy in Arizona threatening legal action if he communicated with Integrated Resorts or any third parties regarding "Discovery Global contracts and business."

114.    The DG Defendants' unauthorized use of the DISCOVERY marks has caused confusion in the Marketplace.[1]  Examples of this confusion include:

a.    Dolphin Capital contacting DLC's affiliate on August 4, 2020 expressing confusion regarding Buchan's interest in developing the "The One and Only" project in Greece as a "non-branded Discovery project";

b.    Integrated Resorts contacting DLC on November 22, 2020 expressing confusion by the dialogue and content of Defendants' presentation materials.

115.    Upon information and belief, the DG Defendants continued using the "Discovery Global" name/mark as well as the DISCOVERY marks to pursue the development projects identified in DG's alleged "pipeline" after DLC's clear direction to cease use.

116.    Upon information and belief, the DG Defendants intend to continue using the "Discovery Global" name/mark in the future.

117.    On October 26, 2020 (after commencement of the instant lawsuit), the DG Defendants filed an amended complaint in the Utah action seeking a declaratory judgment of non-infringement, alleging that DLC does "not own any legally protectable right to

---

[1] Marketplace in this context is defined as land sellers, joint venture developers, capital partners, and end-user property purchasers.

76991854.1

1    exclude [the DG Defendants] from using the name "Discovery Global."

2    118.    The DG Defendants' declaratory judgment claim remains pending in the

3    Utah action.

4    **V.    The AC Defendants**

5    119.    On or about October 7, 2020, Buchan formed AC and ACM to pursue real

6    estate development projects and, concurrently or around the same time, sought to and did

7    hire numerous former executives and agents of Plaintiffs to perform for AC the same or

8    functionally the same duties as they had been performing for Plaintiffs.

9    120.    AC has hired at least the following DLC or Discovery Design executives

10   and employees for AC's executive team: (i) Buchan is a co-founder of AC and its CEO;

11   (ii) DLC's former CFO, Tom Hogan is a co-founder of AC and its CFO; (iii) DLC's

12   former Chief Marketing Officer, Carol Taylor is the CMO of AC; (iv) DLC's former VP

13   of Business Strategy and Analytics, Ryan Butters is the Chief Strategy Officer of AC; (v)

14   DLC's former Director of Information Technology, James Bailey is the VP of Operations

15   & Technology for AC; and (vi) DLC's former employee, Emily Mayer is the VP of

16   Marketing for AC.

17   121.    Upon information and belief, AC has hired Joseph Buchan to serve as its

18   VP of Finance as of the first quarter of 2021.

19   122.    The AC executive team is primarily comprised of individuals previously

20   serving the DG Defendants—*i.e.*, Buchan, Tom Hogan, Carol Taylor, Ryan Butters and

21   Emily Mayer were all employees and/or agents of the DG Defendants prior to working

22   for AC.

23   123.    Upon information and belief, the AC Defendants are now pursuing the

24   development projects identified in DG's alleged "pipeline."    For example, the AC

25   Defendants continue to communicate with Integrated Resort in pursuit of the Amaala

26   project and have entered a partnership with Extell Development to develop the Mayflower

27   project in Utah.

28

76991854.1

**VI.    Defendants' Misappropriation of DLC's Customer Database**

124.    On or about September 14, 2020, Buchan (using the misleading and infringing e-mail address Becky@discoveryglobal.co) exchanged e-mails with Denton House and DG employees (using @discoveryglobal.co) outlining the DG Defendants' intention to solicit work in relation to the DLC-sourced Mayflower project in Utah.  In this email-exchange, Buchan:

> a.    assigned various tasks to Denton House and DG employees to complete the DG Defendants' "Mayflower Investor Desk"—*i.e.*, a slide presentation that Buchan intended to distribute to consumers the following week; and

> b.    instructed Carol Taylor (DLC's former CMO) to use DLC's confidential and proprietary Customer Database for "Sales & Marketing" and "Customer Acquisition" purposes.

125.    Of the many former executives, employees and agents of Plaintiffs now working for or with Defendants, at least Buchan (CEO for DG and AC) and Carol Taylor (CMO for DG and AC) had access to DLC's confidential and proprietary Customer Database prior to resigning their DLC-executive positions.  Buchan and Carol Taylor (as well as any former executives, employees or agents of Plaintiffs who had access to DLC's Customer Database) were well-aware of the economic value, confidentiality and restricted-use policies governing use of that database.

126.    Upon information and belief, Buchan, Ms. Taylor, or others acting at the direction of or as agents for Defendants accessed and made an unauthorized copy of the Customer Database prior to resigning their DLC positions.

127.    Defendants have threatened to use and, upon information and belief, have wrongfully used DLC's Customer Database to advance their real estate development business to the detriment of DLC.

**VII.    AC Defendants' False and Misleading Advertisements**

128.    To promote their real estate development business, the AC Defendants are operating the website, arete-collective.com (the "AC Website") and disseminating

promotional materials to consumers including, but not limited to, a presentation describing AC's "Portfolio of Experience" which primarily consists of work allegedly performed at DLC communities (the "AC Presentation").

129.    The AC Website displays a number of images of DLC communities, including: (i) an image of the distinctive ceiling at DLC's Chileno Bay Golf and Beach Club; and (ii) an image of DLCs distinctive Yellowstone Club (collectively, the "DLC Resort Images").

130.    The AC Defendants' display of the DLC Resort Images in connection with the "Areté" name and "developer" statements—*e.g.*, that "Areté Collective is a fully-integrated developer of luxury escapes"—constitutes false and misleading advertising because AC was not involved with the development of the communities shown in the DLC Resort Images.

131.    The AC Presentation falsely represents that Denton House "operated" Discovery Design for the past decade.

132.    The AC Presentation falsely represents that AC's executives performed: (i) "community visioning" and "operational startup and activation" for the DLC's Summit Club in Nevada; (ii) "acquisition" and "interior design" for DLC's CostaTerra Golf & Ocean Club in Portugal; (iii) "community visioning" and "amenity interior design" for DLC's James Island in Canada; (iv) "overall community" for DLC's Silo Ridge Golf & Country Club in New York; (v) "community visioning" for DLC's Makena Golf and Beach Club in Hawaii; (vi) "sales and marking, public relations" for DLC's The Hills in New York; and (vii) "community visioning" for DLC's Playa Grande Beach Club in Dominican Republic.

133.    The AC Presentation misleadingly suggests that AC has created "25+ Master Planned Luxury Communities and Private Clubs" as a result of "previous collaborations" with DLC.

134.    The AC Presentation creates a false, misleading and deceptive impression concerning AC's "Portfolio of Experience" and the work previously performed by its

28

employees in relation to DLC's club communities.

135.    Similar to the AC Website, the AC Presentation also displays images of DLC developed resorts in connection with the "Areté" name and "developer" statements, and therefore constitutes false and misleading advertising because AC was not involved with the development of the communities shown in the images.

136.    Upon information and belief, the AC Defendants have distributed the AC Presentation to Integrated Resorts and other consumers involved in the development projects identified in DG's alleged "pipeline" as well as those identified in DLC's Customer Database.

137.    Consumers are likely to be deceived by the AC Website and AC Presentation (collectively, "False and Misleading Advertisements").

138.    The AC Defendants' False and Misleading Advertisements are causing irreparable harm to DLC's reputation and goodwill, tainting its brand and compromising its ability to effectively market and sell its development products and services.

139.    The AC Defendants have engaged in the conduct at issue intentionally, willfully and maliciously with knowledge that their False and Misleading Advertisements cause harm to Plaintiffs and deceive consumers.

## **FIRST CAUSE OF ACTION**

### **Infringement of a Federal Trademark under 15 U.S.C. § 1114(1)**

### **(By DLC Against the DG Defendants and Denton House)**

140.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

141.    The DG Defendants' and Denton House's use of the word "Discovery," including in variants of the name "Discovery Global," their website and email addresses, and signature blocks, as described above, is confusingly similar to and infringes DLC's federally registered DISCOVERY marks as depicted in Exhibits A and B.

142.    Defendants' actions are likely to cause confusion, cause mistake, or to deceive the purchasing public and others, whereby they would be led to mistakenly

76991854.1

believe that the Defendants are affiliated with, related to, sponsored by, or connected with DLC, in violation of 15 U.S.C. § 1114(1).

143.    Although actual confusion is not required for infringement to occur, DLC is informed that actual confusion exists in the Marketplace as a result of the DG Defendants' and Denton House's unauthorized use of the DISCOVERY marks. Defendants are aware of the DISCOVERY marks, the value of those marks in the industry and DLC's extensive use and promotion of its brand due to Buchan's formerly close affiliation with DLC.

144.    Notwithstanding Defendants' knowledge of the DISCOVERY marks and DLC's demands for Defendants to cease use of the marks, Defendants continued to do so and intend to resume use in the future in an effort to trade on the goodwill that DLC has developed in the marks, all of the damage of DLC.

145.    Defendants' actions were designed to deceive and mislead consumers into believing that the DG Defendants are associated with DLC through the use of confusingly similar marks.

146.    Defendants' actions have caused and will continue to cause irreparable injury to DLC in the future for which there is no adequate remedy at law.

147.    Defendants have been instructed to cease using the DISCOVERY marks but have refused to do so despite their knowledge of DLC's federally registered marks. Accordingly, Defendants' infringement is willful and DLC is entitled to recover treble damages and attorneys' fees under 15 U.S.C. § 1117.

148.    At all material times, Buchan was acting as employee and/or agent of the DG Defendants and/or Denton House.  The DG Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan's unlawful conduct.

149.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

76991854.1

**SECOND CAUSE OF ACTION**

**Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125(a)**

**(By DLC Against the DG Defendants and Denton House)**

150.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

151.    This is a claim for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), arising from the DG Defendants' and Denton House's actions including, without limitation, use of a false designation of origin which is likely to cause confusion, mistake, or deception as to origin, sponsorship, or approval of Defendants' services, in violation of 15 U.S.C. § 1125(a).The DISCOVERY marks have come to represent and symbolize high quality development projects, and properties synonymous with luxury and unparalleled service.

152.    Defendants are not authorized to use the DISCOVERY marks.  In fact, Defendants were specifically instructed to stop using the marks but their use continued, unabated and Defendants have demonstrated an intent to resume use in the future.

153.    Defendants' use of the "Discovery Global" name/mark (including in their e-mail addresses) is and was intentional, willful, and in reckless disregard for DLC's trademark rights.

154.    Defendants' actions described above has misappropriated and diminished the value DLC's created in the DISCOVERY marks.

155.    Defendants' actions described above have unjustly enriched Defendants.

156.    Defendants' actions described above have and will continuing to cause irreparable injury to DLC in the future for which there is no adequate remedy at law.

157.    Defendants' actions described above constitute false designation of origin entitling DLC to remedies set forth in 15 U.S.C. §§ 1117 and 1118.

158.    At all material times, Buchan was acting as employee and/or agent of the DG Defendants and/or Denton House.  The DG Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan's unlawful conduct.

159.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

## THIRD CAUSE OF ACTION

### Trademark Dilution under A.R.S. § 44-1448.01

### (By DLC Against the DG Defendants and Denton House)

160.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

161.    Defendants' use and intended future use of the "Discovery Global" name/mark is likely to cause dilution of the distinctive quality of DLC's famous and valuable marks and is likely to cause injury to DLC's business reputation in violation of A.R.S. § 44-1448.01.

162.    Defendants' selection of the "Discovery Global" name/mark was done with full knowledge and awareness of DLC's famous marks.

163.    Defendants willfully intended to trade on DLC's reputation and/or to cause dilution to DLC's famous marks.

164.    Defendants' dilution of the DISCOVERY marks has caused and will continue to cause irreparable injury and damage to DLC's business, reputation, and goodwill in the future for which there is no adequate remedy at law.

165.    At all material times, Buchan was acting as employee and/or agent of the DG Defendants and/or Denton House.  The DG Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan's unlawful conduct.

166.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

///

///

///

76991854.1

## **FOURTH CAUSE OF ACTION**

### **Common Law Trademark Infringement and Unfair Competition**

### **(By DLC Against the DG Defendants and Denton House)**

167.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

168.    Defendants' acts complained of herein constitute trademark infringement and unfair competition under the laws of the State of Arizona.

169.    Defendants' use and intended future use of their infringing "Discovery Global" name/mark is likely to cause Marketplace confusion to consumers of the State of Arizona.

170.    Defendants have acted with intent, through multiple business communications, to cause Marketplace deception and confusion.  Indeed, Defendants have used the "Discovery Global" name/mark, the DISCOVERY marks and DLC's proprietary Customer Database in their efforts to confuse the public and to unfairly compete with DLC for development business.

171.    Defendants' acts complained of herein were intentional, wanton, willful, and committed in bad faith with the intent to confuse and deceive the public.

172.     Defendants have been unjustly enriched and have caused damage to DLC's business, reputation, and goodwill.

173.    Additionally, DLC has federal and common law rights in the DISCOVERY marks through the use of those marks in commerce, such rights existing long before any use by Defendants of the "Discovery Global" name/mark.

174.    Defendants' acts complained of herein constitute common law infringement of the DISCOVERY marks.

175.    Upon information and belief, Defendants have undertaken these acts willfully and with the intent to trade on DLC's reputation and to cause confusion, mistake, and deception.

176.    Defendants' acts complained of herein have caused and will continue to

76991854.1

cause DLC irreparable harm in the future for which there is no adequate remedy at law. Upon information and belief, as a direct and proximate result of these violations, DLC has sustained actual losses and damages.

177.    At all material times, Buchan was acting as employee and/or agent of the DG Defendants and/or Denton House.  The DG Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan's unlawful conduct.

178.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

## FIFTH CAUSE OF ACTION

**Violation of the Defend Trade Secrets Act under 18 U.S.C. § 1836**

**(By DLC Against the DG Defendants, AC Defendants and Denton House)**

179.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

180.    DLC owns and possesses certain confidential, proprietary and trade secret information, as alleged above and includes, without limitation, DLC's Customer Database.

181.    DLC has taken reasonable measures to keep such information, including the Customer Database, secret and confidential.

182.    Defendants wrongfully acquired, used and/or disclosed trade secrets within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1836, which belong to and are proprietary to DLC and which derive economic value from the fact that they are not known to others and which are not readily ascertainable by proper means by others.

183.    The trade secrets improperly acquired, used, and/or disclosed by Defendants relate to DLC's Customer Database.

184.    DLC's Customer Database is a valuable and lucrative asset of DLC that constitutes a legally protectable trade secret.

185.    DLC developed and retains all rights to the DLC's Customer Database and

all information contained therein.

186.    DLC's Customer Database is secret, of value, related to a product or service used in, or intended for use in, interstate or foreign commerce, and is thus a trade secret pursuant to 18 U.S.C. § 1836.

187.    Defendants know, or have reason to know, that DLC does not consent to Defendants' continued use of the Customer Database and, given the confidential and proprietary nature of the Customer Database, Defendants' continued use of the Customer Database without permission from DLC violates 18 U.S.C. § 1836.

188.    Defendants have wrongfully benefited from their misappropriation of DLC's trade secrets, and DLC has been damaged by this misappropriation in an amount to be determined at trial.

189.    Defendant's misappropriation of DLC's trade secrets for their own benefit was attended by circumstances of fraud, malice, and a willful and wanton disregard of DLC's rights. Thus, DLC is entitled to damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

190.    DLC has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

191.    As a result of Defendants' misappropriation of DLC's trade secrets, DLC has suffered and will continue to suffer great and irreparable harm for which no adequate remedy at law exists.

192.    Unless Defendants are preliminarily and permanently enjoined from further misappropriation of DLC's trade secrets, Defendants will continue to suffer great and irreparable harm for which no adequate remedy at law exists.

193.    At all material times, Buchan and Carol Taylor were acting as employees and/or agents of the DG Defendants, AC Defendants and/or Denton House.  The DG Defendants, AC Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan and/or Taylor's unlawful conduct.

194.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally

76991854.1

1    liable for the harm caused, debts and obligations of the other.

2    195.    At all material times, the AC Defendants and Denton House were acting in

3    concert and in furtherance of a joint enterprise and are therefore jointly and severally

4    liable for the harm caused, debts and obligations of the other.

5                            **SIXTH CAUSE OF ACTION**

6          **Misappropriation of Trade Secrets under A.R.S. § 44-401, *et seq.***

7       **(By DLC Against the DG Defendants, AC Defendants and Denton House)**

8    196.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein

9    all previous allegations.

10    197.    DLC's proprietary and confidential Customer Database constitutes a trade

11    secret as set forth in A.R.S. § 44-401, *et seq*.

12    198.    The Customer Database is of substantial value to DLC and also would be

13    of great value to its competitors.

14    199.    The information compiled and maintained in DLC's Customer Database

15    could not be compiled from sources that are a matter of public knowledge.

16    200.    DLC maintained reasonable security measures to protect the secrecy and

17    confidentiality of its Customer Database.

18    201.    DLC's Customer Database is protectable as a trade secret because it

19    represents a selective accumulation of detailed, valuable information about customers and

20    potential customers, business contacts and/or investors that would not naturally be

21    available to those in the business without substantial efforts to develop such information.

22    202.    DLC's Customer Database was developed through substantial efforts to

23    identify and cultivate its customer base over the course of decades in the business.

24    203.    DLC's Customer Database provides a source of competitive advantage to

25    DLC over others in the industry.

26    204.    Defendants have threatened to use and upon information and belief, are

27    using DLC's Customer Database to market their real estate development business and

28    compete with DLC.

76991854.1

205.    Defendants have misappropriated DLC's trade secrets through improper means, disclosure and/or use of such trade secrets in violation of A.R.S. § 44-401, *et seq*.

206.    Defendants have misappropriated DLC's Customer Database for their own benefit and for the purpose of competing with DLC.

207.    As a direct and proximate result of Defendants' wrongful conduct, DLC has suffered and will continue to suffer, incalculable financial loss, loss of the confidentiality of its trade secrets as well as loss of competitive advantage, goodwill and other damages.

208.    Without injunctive relief, DLC will suffer irreparable injury for which there is no adequate remedy at law.

209.    As a result of Defendants' wrongful conduct, DLC is entitled to preliminary and permanent injunctive relief, damages in an amount to be determined at trial and attorneys' fees and costs.

210.    At all material times, Buchan and Carol Taylor were acting as employees and/or agents of the DG Defendants, AC Defendants and/or Denton House.  The DG Defendants, AC Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan and/or Taylor's unlawful conduct.

211.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

212.    At all material times, the AC Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

## SEVENTH CAUSE OF ACTION

**False and Misleading Advertising and Promotion under 15 U.S.C. § 1125(a)**

**(By All Plaintiffs Against the AC Defendants and Denton House)**

213.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

214.    Defendants, though the False and Misleading Advertisements, willfully,

76991854.1

deliberately, and egregiously made false and misleading statements of fact which were intended to, and did, mislead consumers.

215.    Defendants' False and Misleading Advertisements are literally false, either on their face or by necessary implication, or are materially misleading.

216.    Defendants used the False and Misleading Advertisements to directly solicit consumers, including Integrated Resorts, which financially benefited Defendants and caused damages and harm to Plaintiffs.

217.    Defendants' False and Misleading Advertisements either deceived or had the capacity to deceive a substantial segment of relevant consumers.

218.    Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain the AC Defendants' services.

219.    Defendants' advertised services affect interstate commerce.

220.    Plaintiffs have been and continues to be injured as a result of these false and misleading statements.

221.    Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to recover (i) its actual damages sustained as a result of the False and Misleading Advertising, (ii) Defendants' profits resulting from their False and Misleading Advertising, and (iii) the costs of the action.

222.    Furthermore, the conduct alleged herein was undertaken willfully and with the intention of causing confusion, mistake, or deception, making this an exceptional case entitling Plaintiffs to recover additional damages and reasonable attorneys' fees under 15 U.S.C. § 1117.

223.    Defendants' conduct has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs for which there is no adequate remedy at law.  As such, pursuant to 15 U.S.C. § 1116, Plaintiffs seek an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. § 1125(a).

224.    At all material times, Buchan was acting as employee and/or agent of the AC Defendants and/or Denton House.  The AC Defendants and/or Denton House are

therefore liable for the harm and damages caused by Buchan's unlawful conduct.

225.   At all material times, the AC Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

### (By DLC Against the DG Defendants and Denton House)

226.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

227.   DLC provided the DG Defendants financial resources, employee time and effort, and limited authorized use of the DISCOVERY marks (until the relationship was terminated and the authorization was expressly revoked) with the reasonable expectation that DLC would receive compensation in the form of a controlling interest in the operation, management and income of the venture.

228.   Defendants have economically benefitted from the contributions provided by DLC and have been unjustly enriched to DLC's detriment.

229.   It would be inequitable and unjust to allow Defendants to retain the economic benefits conferred upon them without compensation to DLC.

230.   By engaging in the conduct complained of herein, Defendants will, through continued use of "Discovery Global" name/mark induce consumers to conduct business with Defendants.

231.   By engaging in the conduct complained of herein, Defendants have been, or will be, unjustly enriched by Defendants' ability to obtain business using marks confusingly similar to the DISCOVERY marks.

232.   Defendants have been enriched by their misappropriation and use of DLC's proprietary and confidential Customer Database as described herein.

233.   Upon information and belief, Defendants have wrongfully used DLC's Customer Database to the detriment and harm of DLC.

76991854.1

234.    As a proximate result of Defendants' unlawful conduct, Defendants have or will obtain revenues by which they will be unjustly enriched at DLC's expense.

235.    Under the circumstances alleged herein, it would be unfair and inequitable for Defendants to retain income, profits, or goodwill it unjustly obtains at the expense of DLC.

236.    DLC has no adequate remedy at law.

237.    As a result of Defendants' wrongful conduct, DLC is entitled to the preliminary and permanent injunctive relief requested herein and damages in an amount to be proven at trial.

238.    DLC further seeks an order establishing Defendants as constructive trustees of any profits by which they are unjustly enriched, together with interest during the period when Defendants retain such funds, and requiring Defendants to disgorge those funds to DLC.

239.    At all material times, Buchan was acting as employee and/or agent of the DG Defendants and/or Denton House.  The DG Defendants and/or Denton House are therefore liable for the harm and damages caused by Buchan's unlawful conduct.

240.    At all material times, the DG Defendants and Denton House were acting in concert and in furtherance of a joint enterprise and are therefore jointly and severally liable for the harm caused, debts and obligations of the other.

## NINTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (By All Plaintiffs Against Buchan)

241.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

242.    Plaintiffs authorized Buchan to act as the President of Discovery Design and COO of DLC, subject to Plaintiffs' control.

243.    Buchan agreed to serve as the President of Discovery Design and COO of DLC and did, in fact, provide services to Plaintiffs as their authorized agent.

244.    Acting as Plaintiffs' authorized agent, Buchan had the ability to affect the legal relations of Plaintiffs in its transactions with third parties.

245.    In all matters and transactions connected to her agency relationship with Plaintiffs, Buchan had a fiduciary duty to: (i) act for the benefit of Plaintiffs; (ii) refrain from competing with Plaintiffs; (iii) deal fairly and in good faith with Plaintiffs; and (iv) disclose all facts relevant to Plaintiffs' decision in accepting and continuing the agency relationship.

246.    Intentionally, with knowledge that her conduct would cause substantial harm and for purposes of pecuniary gain, Buchan breached her fiduciary duties to Plaintiffs by, *inter alia*:

a.    failing to act for the benefit of Plaintiffs and in good faith for all matters and transactions;

b.    directing payments to Denton House exceeding the amounts due under the terms of the ICA without disclosure to or approval from appropriate disinterested and informed executives with authority to approve such payments;

c.    directing Discovery Design to write off substantial amounts as "bad debt" to benefit Denton House without disclosure to or approval from appropriate disinterested and informed executives with authority to approve such payments;

d.    operating the DG Defendants in competition with DLC prior to the termination of the agency relationship;

e.    using DLC's brand and the DISCOVERY marks to solicit customers and development projects on behalf of the DG Defendants;

f.    using DLC's Customer Database to promote and advance the business operations of the DG Defendants;

g.    failing to disclose that she was acting as agent for the DG Defendants with respect to services performed in furtherance of DLC's existing and prospective development projects;

h.    failing to disclose that her communications with DLC's actual and

41

76991854.1

prospective customers were intended to benefit the DG Defendants;

    i.  attempting to usurp DLC's business opportunities for the benefit of the DG Defendants; and

    j.  attempting to destroy DLC's business records to conceal unlawful activity.

  247. As a direct and proximate result of Buchan's breach of fiduciary duties, Plaintiffs have suffered and will continue suffer damages in an amount to proven at trial.

  248. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be determined by a jury.

**TENTH CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**(By Discovery Design Against Pace)**

  249. Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

  250. Discovery Design authorized Pace to serve as its VP of Finance, subject to Discovery Design's control.

  251. Pace agreed to serve as Discovery Design's VP of Finance and did, in fact, provide services to Discovery Design as its authorized agent.

  252. Acting as Discovery Design's authorized agent, Pace had the ability to affect the legal relations of Discovery Design in its transactions with third parties, including Denton House.

  253. In all matters and transactions connected to his agency relationship with Discovery Design, Pace (a licensed CPA) had a fiduciary duty to: (i) act for the benefit of Discovery Design; (ii) refrain from competing with Discovery Design; (iii) deal fairly and in good faith with Discovery Design; and (iv) disclose all facts relevant to Discovery Design's decision in accepting and continuing the agency relationship.

  254. Pace breached his fiduciary duties to Discovery Design by, *inter alia*:

    a.  failing to act for the benefit of Discovery Design and in good faith

42

for all matters and transactions;

        b.    making payments to Denton House exceeding the amounts due under the terms of the ICA without informing or seeking approval from appropriate disinterested and informed executives with authority to approve such payments;

        c.    making payments to Denton House without documentation to substantiate its invoices without informing or seeking approval from appropriate disinterested and informed executives with authority to approve such payments;

        d.    writing off substantial amounts as "bad debt" to the detriment of Discovery Design without informing or seeking approval from appropriate disinterested and informed executives with authority to approve such payments; and

        e.    failing to disclose wrongful acts committed by Denton House and Buchan despite knowledge of their conduct.

255.    As a direct and proximate result of Pace's breach of fiduciary duties, Discovery Design has suffered and will continue suffer damages in an amount to proven at trial.

## **ELEVENTH CAUSE OF ACTION**

### **Professional Negligence**

### **(By Discovery Design Against Pace)**

256.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

257.    As a licensed CPA in the State of Arizona, Pace owed a duty to exercise reasonable care, skill and diligence in performing services for Discovery Design.

258.    Pace breached his duties of care to Discovery Design by, *inter alia*:

        a.    failing to act for the benefit of Discovery Design and in good faith for all matters and transactions;

        b.    making payments to Denton House exceeding the amounts due under the terms of the ICA without informing or seeking approval from appropriate disinterested and informed executives with authority to approve such payments;

c.    making payments to Denton House without documentation to substantiate its invoices without informing or seeking approval from appropriate disinterested and informed executives with authority to approve such payments;

d.    writing off substantial amounts as "bad debt" to the detriment of Discovery Design without informing or seeking approval from appropriate disinterested and informed executives with authority to approve such payments; and

e.    failing to disclose wrongful acts committed by Denton House and Buchan despite knowledge of their conduct.

259.    As a direct and proximate result of Pace's breach of duties, Discovery Design has suffered and will continue suffer damages in an amount to proven at trial.

## TWELFTH CAUSE OF ACTION

### Aiding and Abetting Tortious Conduct

### (By Discovery Design Against Denton House, Buchan and Joseph Buchan)

260.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein all previous allegations.

261.    The tortious conduct committed by Pace as described herein caused injury to Discovery Design.

262.    Defendants knew that Pace's conduct was unlawful and a breach of his fiduciary duties as well as his duties of reasonable care.

263.    Defendants substantially directed, assisted, endorsed and encouraged Pace in the achievement of his tortious conduct.

264.    Intentionally, with knowledge that their conduct would cause substantial harm and for purposes of pecuniary gain, Defendants individually and in concert, ratified, sanctioned, instructed and/or directed Pace to:

a.    make payments to Denton House exceeding the amounts due under the terms of the ICA;

b.    make payments to Denton House without documentation to substantiate its invoices; and

44

c.    write off substantial amounts as "bad debt" to the detriment of Discovery Design.

265.    As a direct and proximate result of Defendants' acts, Discovery Design has suffered and will continue to suffer damages in an amount to be proven at trial.

266.    Discovery Design is entitled to recover compensatory and punitive damages in an amount to be determined by a jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment and relief against Defendants as follows:

A.    An order entering judgment against Defendants and in favor of Plaintiffs on all causes of action stated herein;

B.    A preliminary and permanent injunction prohibiting Defendants and any employees, officers, members, managers, agents, representatives, successors, affiliates, assigns and any entities owned or controlled by Defendants, and all those in active concert and participation with Defendants, from:

i.    using the "Discovery Global" name/ mark, or any other marks confusingly similar to the DISCOVERY marks;

ii.    using any trademark, service mark, name, logo, domain name, or source designation that is a copy, reproduction, colorable imitation, or confusingly similar to the DISCOVERY marks, or likely to cause consumer confusion, mistake, or to deceive consumers that Defendants' products originate from DLC or are authorized by, sponsored by, endorsed by, or otherwise affiliated with DLC; and

iii.    using the trade secrets of Plaintiffs including, but not limited to, its Customer Database; and

iv.    directly or indirectly engaging in false, misleading, or deceptive advertising or promotions including, but not necessarily limited to, the False and Misleading Advertising alleged herein or in any other electronic or print media or materials.

76991854.1

C.    An order requiring Defendants to correct any erroneous impression customers may have derived concerning their use of the DISCOVERY marks or "Discovery Global" name/mark.

D.    An order requiring Defendants to correct any erroneous impression customers may have derived concerning the nature, characteristics, or qualities of the Defendants' services or the False and Misleading Advertisements;

E.    An award to Plaintiffs for damages in an amount to be determined by a trier of fact for all harm caused by Defendants' actions, including Defendants' profits, the damages sustained by Plaintiffs, costs of the action, reasonable attorneys' fees, treble damages and profits as authorized by law and punitive damages;

F.    An award of Plaintiffs' interest, including prejudgment interest, on the foregoing amounts;

G.    An order requiring Defendants to provide for destruction of all products, labels, signs, prints, advertisements or other materials in Defendants' possession bearing the infringing "Discovery Global" name/mark, or any other word, term, name, symbol, device, or combination thereof, designation, description or representation that is a reproduction, counterfeit, copy, or colorable imitation of the DISCOVERY marks;

H.    An order requiring Defendants to provide for destruction of Plaintiffs' trade secret information including, but not limited to, its Customer Database;

I.    An order establishing Defendants as constructive trustees of any profits by which they are unjustly enriched, together with interest during the period when Defendants retain such funds, and requiring Defendants to disgorge those funds to DLC; and

J.    Any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

///

///

76991854.1

Dated this 3rd day of March, 2021.

By:  /s/ *Eric E. Lynch*

**POLSINELLI PC**
Eric E. Lynch
Jonathan G. Brinson
Michelle M. Buckley
John R. Posthumus (*Pro Hac Vice*)
One East Washington St., Suite 1200
Phoenix, AZ 85004

**O'MELVENY & MYERS LLP**
Daniel M. Petrocelli (*Pro Hac Vice*)
Jeffrey A. Barker (*Pro Hac Vice*)
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067

*Attorneys for Plaintiff Discovery Land*
*Company, LLC and Discovery Design, LLC*

76991854.1

**VERIFICATION**

I, Michael S. Meldman, in my capacity as the founder and Chief Executive Officer of Discovery Land Company, LLC and the managing-member of Discovery Managers, LLC, the manager of Discovery Design, LLC declare that I have read and know the contents of the foregoing Amended Verified Complaint, and as to the factual allegations contained therein, believe them to be true and correct to the best of my knowledge information and belief, which is formed by personal knowledge and/or the business records of Plaintiffs.  Pursuant to Rule 80(i), Ariz.R.Civ.P., I declare under penalty of perjury that the foregoing is true and correct.

Dated:    March 2  , 2021.

Michael S. Meldman

76991854.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2021, I electronically transmitted the foregoing document to the U.S. District Court Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Douglas C. Northup
FENNEMORE CRAIG, P.C.
2394 E. Camelback Rd., Suite 600
Phoenix, Arizona 85016
dnorthup@fclaw.com

Stephen Q. Wood
Jeffrey C. Wu
QUINN EMANUEL URQUHART & SULLIVAN, LLP
60 East South Temple Street, Suite 500
Salt Lake City, Utah 84111
stephenwood@quinnemanuel.com
jeffreywu@quinnemanuel.com

By: */s/ A. Renteria*

76991854.1